# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Lee Hesselroth,                                     Civ. No. 11-1417 (JRT/JJK)

       Plaintiff,

v.

Michael J. Astrue,                        **REPORT AND RECOMMENDATION**
Commissioner of Social
Security,

       Defendant.

Jennifer G. Mrozik, Esq., Hoglund, Chwialkowski & Mrozik, PLLC, counsel for
Plaintiff.

David W. Fuller, Esq., Assistant United States Attorney, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

       Pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3), Plaintiff Lee Hesselroth

seeks judicial review of the final decision of the Commissioner of Social Security

("the Commissioner"), who denied Plaintiff's applications for disability insurance

benefits and supplemental security income.  The parties have filed cross-motions

for summary judgment.  (Doc. Nos. 11, 14.)  This matter has been referred to the

undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636,

and D. Minn. LR 72.1.  For the reasons stated below, this Court recommends

that Plaintiff's motion be denied and Defendant's motion be granted.

**BACKGROUND**

**I.    Procedural History**

Plaintiff protectively filed applications for disability insurance benefits and

supplemental security income on February 23, 2007, alleging a disability onset

date of November 15, 1996.  (Tr. 97–98, 99–110.)[1]  Plaintiff later amended his

onset date to November 1, 2006.  (Tr. 13, 25.)  The applications were denied

initially and on reconsideration.  (Tr. 27–51, 58–63.)  Plaintiff timely requested a

hearing, which was held before an Administrative Law Judge ("ALJ") on May 27,

2009.  (Tr. 22–35.)  On July 24, 2009, the ALJ issued an unfavorable decision.

(Tr. 10–21.)  Plaintiff sought review of the ALJ's decision, but the Appeals

Council denied the request for review on March 25, 2011.  (Tr. 1–3.)  The denial

of review made the ALJ's decision the final decision of the Commissioner.  *See*

42 U.S.C. § 405(g); *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005);

*Browning v. Sullivan*, 958 F.2d 817, 822–23 (8th Cir. 1992).  On June 1, 2011,

Plaintiff filed the instant action with this Court seeking judicial review pursuant to

42 U.S.C. § 405(g) and § 1383(c)(3).  The parties have filed cross-motions for

summary judgment.  *See* D. Minn. LR 7.2.

**II.    Statement of Facts**

Plaintiff obtained a bachelor's of science degree in education and also has

training as a nurse assistant.  (Tr. 147.)  He worked as a critical care technician

---

[1]    Throughout this Report and Recommendation, the abbreviation "Tr." is used to reference the Administrative Record (Doc. No. 9.)

in a hospital from 1991 through 1999.  (Tr. 157.)  From 1999 through 2006, he was a self-employed handyman.  (*Id.*)  Plaintiff quit working in November 2006, due to depression, pain, and fatigue.  (Tr. 142.)

### A.    Medical Evidence Dated Before Alleged Onset Date

Plaintiff saw a psychologist for an intake evaluation on March 18, 2004. (Tr. 259–63.)  At that time, Plaintiff had been married for twenty years and had two sons aged eighteen and fifteen.  (Tr. 259.)  He was self-employed in home repair and as an artist.  (Tr. 262.)  Plaintiff's 18-year-old son had bipolar disorder and ADHD, and his 15-year-old son had ADD.  (*Id.*)  Plaintiff's symptoms were having low energy, impatience, and feeling overwhelmed.  (*Id.*)  He also reported chronic headaches and fatigue.  (Tr. 263.)  On mental status examination, his affect was flat, mood was anxious and depressed, thought process was tangential, and insight was average to poor.  (Tr. 261.)  In therapy one year later on March 18, 2005, Plaintiff acknowledged that he usually felt more depressed during this time of year.  (Tr. 237.)

Plaintiff's mood was up and down over the year 2005, tending to be up when Plaintiff had job prospects.  (Tr. 200, 208, 215, 220, 224, 232.)  In November 2005, Plaintiff was more depressed again, and Dr. Charles Gill recommended increasing Cymbalta and decreasing Lexapro.  (Tr. 303.)  On January 11, 2006, Plaintiff reported that he continued to feel depressed daily with low energy.  (Tr. 302.)  Otherwise, Plaintiff's mental status examination, including his memory, attention, and concentration, was normal.  (*Id.*)  At that time, Dr. Gill

increased Plaintiff's Cymbalta. (*Id.*) Plaintiff was also taking Adderall and Ambien. (*Id.*) Dr. Gill diagnosed cyclothymic disorder, depressed; ADHD, predominantly inattentive type; and personality disorder.[2] (*Id.*)

Plaintiff underwent a mental health diagnostic evaluation by Dr. Joyce Stockton at the Well Family Clinic on February 3, 2006. (Tr. 278–81.) Plaintiff reported the following symptoms: anhedonia, depressed mood, decreased energy, hopelessness, worthlessness, guilt, somatic complaints, sleep difficulties, and difficulty concentrating, focusing, and following through. (Tr. 278.) Plaintiff reported that he had periodic episodes of depression since he was a teenager and believed he presently had major depression with seasonal fluctuations. (Tr. 279.) He stated that the 1990s were very difficult for him because he had two young children, and his oldest son had severe mental health issues requiring supervision and monitoring. (*Id.*) Plaintiff stated he was constantly fatigued, and had chronic sinus problems and occasional migraines. (*Id.*) Plaintiff described himself in a manner suggesting he had patterns of ADHD present from a very young age. (*Id.*) And he had not engaged in satisfactory employment since he lost his hospital job due to a work injury several years earlier. (*Id.*) Dr. Stockton

---

[2]     Dr. Gill recorded the DSM-IV codes 301.13 and 314.00 without identifying the disorders by name. 301.13 is the code for cyclothymic disorder and 314.00 is the code for ADHD, predominantly inattentive type. *Diagnostic and Statistical Manual of Mental Disorders* 862, 864 (American Psychiatric Association 4th ed. text revision 2000) ("DSM-IV-tr"). The essential feature of cyclothymic disorder is a chronic fluctuating mood disturbance involving numerous periods of hypomanic symptoms and periods of depressive symptoms, but the symptoms are not of sufficient severity to meet the criteria for manic episodes or major depressive episodes. *Id.* at 398.

diagnosed ADHD, predominantly inattentive type (DSM-IV-tr Code 314.00) and depressive disorder, moderate (DSM-IV-tr Code 296.32) with seasonal pattern. (Tr. 281.) Along with continued counseling and a review of the appropriateness of his medications, Dr. Stockton recommended "[s]upport/skill building for job search and employment." (*Id.*)

In March 2006, Plaintiff was prescribed a CPAP machine based on the results of a sleep study done in 2005, when he was diagnosed with obstructive sleep apnea and hypersomnolence. (Tr. 290.) After wearing the CPAP for three weeks, Plaintiff reported that his daytime sleepiness was slightly better. (Tr. 288.) In May 2006, Plaintiff told Dr. Gill that his mood was better with increased Cymbalta and the onset of spring. (Tr. 300.) At that time, Plaintiff was doing remodeling work and also enjoyed designing chandeliers and landscaping gates. (*Id.*) His mental status examination was normal. (*Id.*) In August 2006, Plaintiff continued to be more productive, but reported that he felt overwhelmed at times; he did not report any other symptoms. (Tr. 298.)

### B. Medical Evidence Dated After Alleged Onset Date

Plaintiff saw Dr. Gill on November 22, 2006, and reported that his mood was worsening with the decreasing sunlight. (Tr. 296.) He felt some benefit from Cymbalta and Adderall. (*Id.*) His energy was low and his mood was sad, but his mental status examination was otherwise normal. (Tr. 297.)[3] Dr. Gill

---

[3]   Dr. Gill recorded "ADD" under the heading for "attention and concentration" of Plaintiff's mental status examinations. (*See, e.g.*, Tr. 297, 392, 395, 428.)

recommended bright light therapy. (*Id.*) In January 2007, Plaintiff reported to Dr. Gill that he did not have any work, and that his mental condition remained the same. (Tr. 293–94.)

When Plaintiff saw Dr. Joyce Stockton for therapy on March 1, 2007, he reported making progress on household projects. (Tr. 317.) And Plaintiff's mood and energy had improved. (Tr. 319.) However, in mid-March, after switching from Ambien to Trazadone for sleep, Plaintiff reported feeling sluggish and unfocused. (Tr. 320.) Plaintiff stated that ever since the difficult period with his children and his job in the 1990s, he had trouble getting up and going in the morning. (Tr. 321.) Plaintiff's wife also stated, however, that when Plaintiff had energy, he did not know what to do with it. (*Id.*) Plaintiff reported feeling better in April 2007. (Tr. 327, 330–31.) He had a job interview, although he was not offered the job. (Tr. 331.) And in May, Plaintiff's mood and energy continued to improve. (Tr. 332.) He was getting some work projects, but he also wanted a change in employment because he had nothing to do in the winter. (*Id.*) He considered doing something else, but that was not likely to occur unless "something attractive [came his] way." (*Id.*) But by the end of May 2007, Plaintiff reported that he was fatigued and sleeping poorly. (Tr. 333.)

Plaintiff had another job interview in June 2007, and he noted that he could not "do what I've been doing." (Tr. 334.) At that time, Plaintiff was taking less Adderall and Ambien and was still sleeping poorly. (Tr. 336.) Later in the month, he reported being discouraged when his low back pain worsened. (Tr. 337.) He

6

reported that he felt like he was caught in a downward slide and wanted to focus on his health.  (*Id.*)  Plaintiff's mood improved in September 2007, but he was still fatigued, which worsened after taking a trip to Texas.  (Tr. 401–02.)  Plaintiff stated he felt he needed medical help before he could "begin to act."  (*Id.*)

On September 21, 2007, Dr. Sandra Eames, a state agency physician, reviewed Plaintiff's social security disability file and opined that Plaintiff's physical conditions were nonsevere.[4]  (Tr. 344.)  Then, on October 2, 2007, Plaintiff underwent a psychological consultative examination with Dr. Craig Barron.  (Tr. 346–50.)  Plaintiff reported that he had been seeing a mental health provider since 1991, and he described his daily activities.  (Tr. 347–49.)  He went to bed at midnight and woke up at 7:30 a.m.  (Tr. 349.)  He bathed and changed clothes every four days.  (*Id.*)  And he reported that he could do the following activities: cook, sweep, mop, vacuum, laundry, drive, shop daily, watch television, work on a computer, read, play solitaire, take pictures, occasionally go out to eat and get together with friends, and spend four hours a week helping a friend build and design things such as bikes.  (*Id.*)  Apart from dysthymia and restricted affect, Dr. Barron concluded that Plaintiff's mental status examination was normal.  (Tr. 347–48.)

Dr. Barron diagnosed Plaintiff with ADHD, predominantly inattentive type; dysthymic disorder; depression, NOS; and drug and alcohol abuse in full

---

[4]    Dr. Aaron Mark reviewed Plaintiff's file and affirmed Dr. Eames' opinion on April 28, 2008.  (Tr. 419–21.)

remission.  (*Id.*)  On the basis of Plaintiff's cognitive abilities, Dr. Barron opined that Plaintiff was capable of communicating, comprehending, and retaining simple directions at an unskilled competitive level.  (Tr. 350.)  On the basis of Plaintiff's social and emotional functioning, Dr. Barron opined that Plaintiff was capable of withstanding work-related stresses, attending work regularly, rapidly performing routine repetitive activities on a sustained basis, meeting production requirements, and relating to others at an unskilled competitive employment level.  (*Id.*)

On October 19, 2007, state agency psychologist Dr. Thomas Kuhlman reviewed Plaintiff's social security disability file and completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form for the Social Security Administration.  (Tr. 354.)  Dr. Kuhlman opined that Plaintiff had an organic mental disorder and personality disorder, causing moderate limitations in daily activities, mild limitations in social functioning, and moderate limitations in concentration, persistence, or pace.  (Tr. 364.) Dr. Kuhlman also opined that Plaintiff could perform routine, repetitive, 3–4 step tasks with adequate persistence and pace, with brief and superficial contact with coworkers and the public, and ordinary supervision.[5]  (Tr. 370.)

Also in October 2007, Plaintiff's primary physician referred him to Dr. Laurie Radovsky at United Family Practice Health Center for evaluation of

---

[5]     Dr. Kuhlman's opinion was affirmed by Dr. R. Owen Nelsen upon reconsideration on April 25, 2008.  (Tr. 418.)

chronic fatigue syndrome. (Tr. 385.)[6] Plaintiff told Dr. Radovsky he associated the onset of his fatigue with his son being diagnosed with bipolar disorder and his father-in-law dying. (*Id.*) By the summer of 2006, Plaintiff was only working four days per week doing odd jobs, and he gradually quit looking for work. (*Id.*) Plaintiff also reported that he had had shoulder and neck pain since an accident in 1978. (*Id.*) He also had constant headaches with only moderate relief from a chiropractor. (*Id.*) On examination, Plaintiff had full range of motion in all joints except decreased movement in the left neck and decreased elevation in the right shoulder. (*Id.*) Plaintiff did not have joint tenderness, deformity, or peripheral edema, and only one out of eighteen fibromyalgia points were positive. (*Id.*) Dr. Radovsky opined that Plaintiff had "probable chronic fatigue syndrome," and that he would be a good candidate for treatment with Lyrica for fatigue and discomfort. (Tr. 386.) During this visit, Dr. Radovsky reassured Plaintiff that his condition was not "related just to depression." (*Id.*)

On November 13, 2007, Plaintiff reported to Dr. Stockton that he felt at a new low mentally and physically, which he blamed on his poor health. (Tr. 406.) Two days later, Plaintiff told Dr. Gill that he was less depressed but staying at home more. (Tr. 394.) Plaintiff reported that Adderall improved his alertness, and that he "resolves to exercise." (*Id.*) One month later, Plaintiff was using light therapy but still struggling with being tired and trying to go to bed earlier.

---

[6]     Plaintiff continued to follow up with Dr. Radovsky after she moved her practice to HealthEast Macalester/Groveland Clinic in October 2008. (Tr. 576.)

(Tr. 407.)  In follow up with Dr. Radovsky on December 22, 2007, Plaintiff reported that Ambien CR was helping him sleep longer, but that he had to get up early to get his son ready for school.  (Tr. 384.)  At that time, Plaintiff completed a fibromyalgia intake form, and Dr. Radovsky opined the following symptoms would "define him as having chronic fatigue":  unrefreshing sleep, worsening after exercise, cognitive dysfunction, tender lymph nodes, headaches, frequent sore throats, pain, and diffuse achiness.  (*Id.*)

When Plaintiff followed up with Dr. Radovsky in February 2008, he had gone to six physical therapy visits at TherEx Rehabilitation and felt immediately better after each session, but then later felt stiff and sore in different places. (Tr. 383.)  Plaintiff reported that Trazadone was making him groggy and melatonin was not helping him sleep.  (*Id.*)  Dr. Radovsky recommended thyroid and diabetes testing, and Plaintiff also agreed to try an elimination diet.  (*Id.*)  At that time, Dr. Radovsky diagnosed fibromyalgia.  (*Id.*)  Also in February 2008, Plaintiff told Dr. Stockton that after a friend moved to Texas, he was feeling very low.  (Tr. 411.)  And Plaintiff told Dr. Gill that although his energy was low, he had some hope for the future with treatment for fibromyalgia and chronic fatigue syndrome.  (Tr. 391.)  Upon visit with Dr. Gill, Plaintiff's mental status examination was normal.  (Tr. 392.)

On March 11, 2008, Plaintiff reported to Dr. Stockton that he had gone four days without a headache and was both sleeping and concentrating better. (Tr. 413.)  Thereafter, Plaintiff then took a ten-day trip to Texas to visit a friend.

(Tr. 415.)  Upon return, Plaintiff reported to Dr. Stockton that he was recently diagnosed with diabetes, and that he needed to get healthy before he could take on a project.  (*Id.*)

On April 2, 2008, during a visit with Dr. Radovsky,  Dr. Radovsky encouraged Plaintiff to work on diet and exercise for diabetes, and to continue with an elimination diet to discover allergens causing chronic sinusitis and to decrease caffeine intake.  (Tr. 436.)  And on April 16, 2008, Plaintiff told his physical therapist that his neck hurt after driving thirty hours to Texas, moving some light furniture, building a workbench with his friend, and flying home. (Tr. 473.)  Plaintiff reported that although his pain was 50% improved since he started physical therapy, his fatigue increased after helping his friend move. (Tr. 472.)  Then, in June 2008, Plaintiff told Dr. Gill that he was less depressed. (Tr. 428.)  During that visit, Plaintiff's mental status examination was normal. (*Id.*)

Plaintiff followed up with Dr. Radovsky on June 24, 2008, and reported that he had not needed pain medication in the spring until he irritated his neck on his trip to Texas.  (Tr. 434.)  He also reported that he continued to have migraines that were treated somewhat effectively by Excedrin Migraine.  (*Id.*)  He felt less depressed, which he stated was normal for him in the summer.  (*Id.*)  At that time, Plaintiff continued to have migratory pain in the joints and grogginess by mid-morning, but he was not napping frequently.  (*Id.*)  Dr. Radovsky recommended that he go to bed earlier and be more consistent with his

11

elimination diet. (*Id.*)  A month later, Plaintiff reported to Dr. Radovsky  that he was still tired and not sleeping well, but that he was making progress, rating his pain only two to five on a scale of one to ten.  (Tr. 430.)

By September 2008, Plaintiff told his physical therapist that his chronic fatigue and fibromyalgia pain were now rare, although he had some muscle discomfort with "mechanical issues."  (Tr. 540.)  Plaintiff's physical therapist completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) form for Plaintiff on September 24, 2008.  (Tr. 485–88.)  She had treated Plaintiff for nine months and opined that he was physically limited to the following:  stand and walk a total of four hours in an eight-hour day, thirty minutes at a time; sit four hours in an eight-hour day, one hour at a time; occasionally carry fifty pounds, frequently kneel; occasionally climb, balance, stoop, crouch, crawl; and frequently reach, handle, feel, push, and pull. (*Id.*)  She also stated that fibromyalgia was the cause of his limitations. (*Id.*)   Then, on October 29, 2008, Plaintiff and his physical therapist discussed jobs that Plaintiff could perform with his current functional status.  (Tr. 529.)  At that time, the therapist noted that Plaintiff had fewer mechanical symptoms and rare fibromyalgia symptoms, but that he continued to struggle with fatigue and motivation. (*Id.*) On November 18, 2008, Plaintiff's physical therapist completed a Fibromyalgia Residual Functional Capacity Questionnaire regarding Plaintiff.  (Tr. 489–92.) She left much of the questionnaire blank, suggesting more objective results could be determined with a functional capacity evaluation (FCE).  (Tr. 490.)  She did,

however, indicate that Plaintiff was capable of low stress, and his pain was seldom severe enough to interfere with his concentration and attention. (Tr. 489–90.)  She also indicated that Plaintiff would sometimes need to take unscheduled breaks during the day and would need to be able to shift positions at will.  (Tr. 491.)

In follow up with Dr. Radovsky on October 30, 2008, Plaintiff also reported a 90% reduction in fibromyalgia pain.  (Tr. 576.)  However, he reported that his energy and focus had decreased, which was typical for him with the change of seasons.  (*Id.*)  He also reported that he felt overwhelmed by the project of organizing his basement.  (*Id.*)  Dr. Radovsky noted that Plaintiff was seeing Psychologist Maureen Gluek to work on pacing and mind-body connection.  (*Id.*)  Dr. Radovsky encouraged Plaintiff to use his light box more consistently. (Tr. 577.)  Several weeks later, Plaintiff's physical therapist noted his improved tolerance for activity after he raked and bagged leaves over the course of four days.  (Tr. 526.)

Upon visit with Dr. Radovsky on November 24, 2008, Plaintiff reported having a flare of fibromyalgia pain and that he was frustrated.  (Tr. 574.)  Plaintiff stated that he was walking and biking as much as he could.  (*Id.*)  At that time, his thyroid test was on the lower end of normal, so Dr. Radovsky prescribed levothyroxine.  (*Id.*)  Then, on December 18, 2008, Dr. Radovsky completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) form regarding Plaintiff.  (Tr. 493–95.)  She indicated that Plaintiff could not work,

13

explaining that his limitations were caused by fatigue, depression, and ADHD. (*Id.*) She also noted that Plaintiff would be markedly limited in maintaining attention and concentration. (Tr. 493.) Dr. Radovsky also completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) form regarding Plaintiff. (Tr. 496–99.) She opined that Plaintiff could stand or walk four hours in an eight-hour day, thirty minutes at a time; sit four hours in an eight-hour day, thirty minutes at a time; occasionally lift thirty pounds, frequently lift five pounds; occasionally climb and balance, reach, handle and feel; and never stoop, crouch, kneel, crawl, push, or pull. (Tr. 496–99.) She stated that her opinion was based on Plaintiff's severe intermittent fatigue and the difficulty predicting when he would have a bad day. (Tr. 499.)

On December 23, 2008, Plaintiff saw Dr. Radovsky again. He reported that he felt no significant improvement in his energy or pain since starting levothyroxine. (Tr. 573.) He was sleeping pretty well but was not always refreshed by sleep. (*Id.*) And he was not using his light therapy regularly, but his mood had improved slightly. (*Id.*) He reported that strenuous activity such as shoveling gave him a headache and backache. (*Id.*) One month later, Plaintiff told Dr. Radovsky that physical therapy had "stripped away" many layers of his pain. (Tr. 571.) However, he resisted exercising at home, even when he had time and energy. (*Id.*) And he complained of irritable bowel syndrome, fatigue, and cognitive dysfunction. (*Id.*) Then, on February 5, 2009, he reported to Dr. Radovsky that he had fairly significant low back pain and cognitive

14

dysfunction.  (Tr. 569.)  Two weeks later, Plaintiff told Dr. Gill that he had

recurring depression and low motivation, and that he had not been using his light

box.  (Tr. 603.)  At that time, Dr. Gill prescribed Effexor because Plaintiff's

insurance would no longer cover Cymbalta.  (*Id.*)

On April 21, 2009, Plaintiff talked to Dr. Radovsky about his therapy with

Psychologist Maureen Gluek, a psychologist at United Family Practice Health

Center.  (Tr. 566.)  Plaintiff stated that Dr. Gluek helped him realize that he does

better with concrete simple directions, and he is not very good at identifying

cause and effect.  (*Id.*)  He also recognized that he was more depressed,

hopeless, and unmotivated than he appeared, especially in the winter.  (*Id.*)

Dr. Radovsky noted that Plaintiff had a significant element of seasonal affective

disorder.  (*Id.*)  Also, his attentional disorder made it difficult for him to follow

through on recommendations.  (*Id.*)  Dr. Radovsky noted, however, that Plaintiff

sounded more in control and organized than he expressed to her.  (*Id.*)

Dr. Gluek completed a Medical Assessment of Ability to Do Work-Related

Activities (Mental) form regarding Plaintiff on May 6, 2009.  (Tr. 618–20.)  She

noted that she began treating Plaintiff in April 2008.  (Tr. 618.)  In a narrative,

Dr. Gluek wrote that when Plaintiff's pain, fatigue, and depression were at an

extreme level, he had trouble with memory, articulation, and organization of

thoughts, reduced stress tolerance, mild difficulty with simple job instructions,

and extreme difficulty with complex job instructions.  (*Id.*)  As his depression

increased, especially in October through March or April, he was depressed,

15

overwhelmed and unmotivated; he had marked difficulty in behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability. (*Id.*) When more depressed, he did not maintain his personal appearance. (*Id.*) These things were better, however, when he was not as depressed. (*Id.*) Additionally, Dr. Gluek noted that ADD interfered with his ability to stay on task, concentrate, and organize his thoughts. (*Id.*)

### III.    Testimony at Administrative Hearing

Plaintiff testified to the following at the hearing before the ALJ on May 27, 2009. (Tr. 26–31.) Plaintiff has a bachelor's degree in elementary education, and before November 2006, he was self-employed, doing home repairs and light remodeling. (Tr. 26.) He quit this work because it wore him down physically and mentally. (*Id.*) He fatigued easily and it took him several days to recover from working. (*Id.*)

Plaintiff described his daily activities. (Tr. 27.) He woke his son and took him to school, and went to any appointments for himself or his son. (*Id.*) He was the primary housekeeper in the family, so he cooked, cleaned, grocery shopped, and did yard work such as mowing and planting. (*Id.*) He neglected a lot of this work, and he tried to do one thing at a time. (*Id.*)

Some of Plaintiff's sleepiness and fatigue might have been from medication side effects. (*Id.*) He took antidepressants and was worse if he stopped taking them. (*Id.*) He also took Adderall, which gave him a few hours during the day where he could think more clearly and stay focused. (Tr. 28.)

Fatigue was a problem for Plaintiff because he had trouble focusing and finding motivation. (*Id.*) He had trouble planning things because he did not know how he would feel on a given day. (*Id.*) He no longer made plans and was socially isolated. (Tr. 28–29.) Once or twice a week, he had bad days. (Tr. 29.) Also, he used to enjoy reading but could now only read a paragraph or two at a time. (*Id.*) And he has trouble completing tasks due to pain and fatigue, so he stops to lie down and relax. (Tr. 29–30.)

Plaintiff used to fix and sell bikes for income in the 1990s, but now he was just cleaning up and selling what he had left, including three bikes that he sold in the spring. (Tr. 30.) Plaintiff also helped a neighbor who had lung cancer. (Tr. 30–31.) For fifteen minutes to several hours a day, he talked with this neighbor, took him on errands, and helped him pack things. (Tr. 31.) His neighbor had since died. (*Id.*)

Steven Bosch also testified at the hearing, as a vocational expert. (Tr. 31–34.) The ALJ asked Bosch a hypothetical question about the type of work a person with the following characteristics could perform: a man between the ages of 18 and 50-years old; impairments of ADD or ADHD; dysthymic disorder; depression, NOS; seasonal affective disorder; chronic fatigue syndrome; fibromyalgia; diabetes; chronic sinusitis; and who was limited to unskilled work with brief and superficial contact with the public, and no rapid or frequent changes in work routine due to decreased stress tolerance. (Tr. 32.) Bosch testified that such a person could not perform Plaintiff's past relevant work but

could perform other work such as molding machine tender (2,000 in-state jobs), hand packaging (5,000 in-state jobs), and bench assembly (20,000 in-state jobs). (Tr. 32.)  If the ALJ added a restriction of light work with respect to lifting and time on his feet, with everything else remaining the same as the first hypothetical question, Bosch testified that the assembly and molding machine operator jobs would still be possible.  (Tr. 33.)

For a third hypothetical question, the ALJ asked Bosch to assume the hypothetical man was unable to understand, remember, or carry out simple instructions or to interact appropriately with others in the workplace, and unable to tolerate stress or changes in the workplace.  (*Id.*)  Bosch testified that competitive employment would not be possible with those restrictions.  (*Id.*)  Also, in response to questioning by Plaintiff's counsel, Bosch testified that being absent from work two or more times per month would typically preclude competitive employment.  (Tr. 34.)

## IV.    Function Reports

Plaintiff completed a function report form for the Social Security Administration on March 22, 2007.[7]  (Tr. 129–36.)  At that time, Plaintiff indicated that he could do the following things:  care for his adult disabled son, care for a dog, cook, housework, yard work, household repairs, shop, art projects, woodworking, bicycling, fishing, and attend church.  (Tr. 129–33.)  Where the

---

[7]    Plaintiff dated the form March 22, 2006, obviously in error, because he alleged a disability onset date of November 1, 2006.  (Tr. 142.)

form required Plaintiff to place a check by activities that were limited by his illness, he checked "completing tasks" and "concentration." (Tr. 134.) He did not check any physical limitations such as lifting, standing, sitting, walking, bending, or kneeling. (*Id.*) Plaintiff described his problems in a narrative as follows:

> My unpredictable mood and low energy have made following up with work plans difficult. I often don't remember having decided to look into things that seemed interesting at an earlier time. I frequently feel paralyzed by the many things I know I should be doing but can't make progress because I get distracted by other things. Especially in the winter, I feel overwhelmed and hopeless about how much I am not doing and unable to believe I have a reason to try. I am intelligent and talented but after years of working at entry level jobs I find myself unable to build or advance myself through these inactive annual episodes. Each year seems to get worse despite counseling and medication.

(Tr. 136.)

Plaintiff's wife also completed a third-party function report form for the Social Security Administration on March 22, 2007. (Tr. 149–56.) She corroborated Plaintiff's activities, and when asked to check a list of activities that were affected by Plaintiff's illness, she checked "completing tasks," "concentration," and "following instructions." (Tr. 154.) Like Plaintiff, she did not check any physical limitations such as lifting, bending, standing, walking, reaching, sitting, or kneeling. (*Id.*) In a narrative, she explained that Plaintiff looks and acts "normal" and "healthy," but "he is often nearly paralyzed in taking constructive actions that require extended thought or work because of his

depression, SADS,[8] ADHD, and fatigue." (Tr. 156.) She further stated, "I think he can become productive again if he could receive more intensive treatment and job training and placement, but his efforts to do this on his own have not been very successful so far." (*Id.*)

## V.    The ALJ's Findings and Decision

On July 24, 2009, the ALJ issued a decision concluding that Plaintiff was not under a disability, as defined in the Social Security Act, at any time from November 1, 2006, through the date of the decision. (Tr. 21.) The ALJ followed the five-step procedure for determining if an individual is disabled. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 1, 2006. (Tr. 15.)

At the second step, the ALJ determined that Plaintiff had severe impairments of attention deficit hyperactivity disorder, depression, dysthymic disorder, and seasonal affective disorder. (*Id.*) The ALJ found Plaintiff did not have the severe impairments of sleep disorder, diabetes, fibromyalgia, or chronic fatigue syndrome. (Tr. 16.) The ALJ found chronic fatigue syndrome and fibromyalgia were not severe because they did not require treatment for twelve months. (*Id.*) The ALJ also found that none of these disorders limited Plaintiff even minimally. (*Id.*)

---

[8]    The Court assumes "SADS" refers to seasonal affective disorder syndrome.

At step three of the disability determination procedure, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 16–17.)  The ALJ considered whether Plaintiff met Listing 12.04, Affective Disorders.  (Tr. 16.)  However, Plaintiff did not meet the "B criteria" of the listing, which requires that the impairment result in at least two of the following:  marked restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; and repeated episodes of decompensation, each of extended duration.  (*Id.*)

The ALJ concluded that Plaintiff had mild restrictions in activities of daily living because Plaintiff could do the following things:  cook, housework, drive, shop, watch television, use a computer, read, play video games, help a friend build and design things, take photos, go out with friends, walk his dog, work on art projects daily, lawn work, household repairs, attend church, woodworking, bicycling, and fishing.  (*Id.*)  The ALJ found that Plaintiff had moderate difficulties in maintaining social functioning because, in an examination setting, he was appropriate and cooperative.  (Tr. 17.)  Also, he could shop, go out to eat, and get along with authority figures, suggesting that he could tolerate at least superficial interactions with others.  (*Id.*)  The ALJ concluded that Plaintiff had only moderate difficulties in maintaining concentration, persistence, or pace because he did not have difficulties in this area with tasks he enjoyed, such as

reading and watching television.  (*Id.*)  Also, Dr. Barron opined that Plaintiff's

intelligence was average.  (*Id.*)  And, during a psychological evaluation, Plaintiff

demonstrated adequate task orientation, cooperation, motivation, and effort.  (*Id.*)

In addition, the ALJ found that Plaintiff had no episodes of decompensation

because he was not hospitalized, he was able to leave his home, and he did not

leave a work-like setting due to psychologically-based symptoms.  (*Id.*)  Finally,

the ALJ found no evidence that Plaintiff met the "C criteria" of the listing.  (*Id.*)

The ALJ determined, at step four, that Plaintiff had the RFC to perform a

full range of work at all exertional levels but with the following nonexertional

limitations:  limited to unskilled work; brief and superficial contact with the public;

and no rapid or frequent changes in work routine due to reduced stress

tolerance.  (Tr. 18.)  The ALJ placed significant weight on the opinion of

Dr. Barron because his opinion was consistent with the record as a whole.  (*Id.*)

The ALJ did not place significant weight on Dr. Radovsky's opinion because the

medical evidence lacked objective findings supporting her opinion, and Plaintiff's

activity level sharply contrasted with the picture she portrayed of Plaintiff.  (*Id.*)

The ALJ also discounted the opinion of Dr. Gluek because the extreme degree of

limitation she suggested was not supported by the objective evidence and

because Plaintiff was active and could pay attention sufficiently to work with his

friend.  (*Id.*)

The ALJ noted that Plaintiff's physical therapist completed some disability

forms for him, but that Plaintiff did not have a severe physical impairment.  (*Id.*)

22

The physical therapist's opinion was that Plaintiff could lift fifty pounds, sit four hours per day, and stand four hours per day. (*Id.*) Also, in October 2008, a physical therapist spoke to Plaintiff about jobs he could perform. (Tr. 19.) The ALJ discounted Plaintiff's subjective complaints because his activities of daily living were inconsistent with disability, and he had significant relief of his symptoms using Ambien, Cymbalta, Effexor, and Adderall. (*Id.*) The ALJ did not give much weight to Plaintiff's wife's opinion because she had incentive to endorse his application. (*Id.*)

Based on the vocational expert's testimony, the ALJ concluded that Plaintiff could not perform his past relevant work as a medical lab technologist or janitor/repairer. (*Id.*) But at step five of the disability determination, the ALJ concluded that there were other jobs that existed in significant numbers in the national economy that Plaintiff could perform, including mold machine tender, hand packager, and assembly. (Tr. 20.)

## DISCUSSION

### I.      Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be

determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

Courts must affirm the ALJ's findings if supported by substantial evidence in the record. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." *Id.* (quotations omitted). The Court must consider evidence that supports and detracts from the ALJ's decision. *Id.* (citations omitted). After reviewing the evidence, if it is possible to draw two inconsistent positions from the evidence, and one of those positions is that of the ALJ, the court must affirm the ALJ. *Id.* (citations omitted).

## II.  Analysis of the ALJ's Decision

Plaintiff raises four issues in support of his motion for summary judgment. First, Plaintiff asserts that the ALJ failed to give proper weight to Plaintiff's treating physicians' opinions and improperly substituted his own lay opinion. Second, Plaintiff contends the ALJ erred in his credibility analysis.  Third, Plaintiff argues the ALJ failed to fully and fairly develop the record concerning Plaintiff's conditions of fibromyalgia, chronic fatigue syndrome, and obstructive sleep apnea.  Fourth, Plaintiff contends the ALJ did not pose an accurate hypothetical question to the vocational expert.

### A.  Whether the ALJ fully and fairly developed the record

Plaintiff contends that if the ALJ was unwilling to accept Plaintiff's treating physicians' diagnoses of fibromyalgia, chronic fatigue syndrome, and sleep apnea, the ALJ should have ordered a consultative examination to clarify the record.  Plaintiff asserts his treatment records confirm his diagnoses, and his treating providers found him to have significant limitations from these conditions, yet the ALJ found the conditions to be nonsevere.  Plaintiff asserts the ALJ failed to incorporate the effects of these conditions into Plaintiff's residual functional capacity, and failed to consider whether these impairments, in combination with Plaintiff's other impairments, equaled a listed impairment.

The Commissioner asserts that the evidence supports the ALJ's determination that chronic fatigue syndrome, fibromyalgia, and obstructive sleep apnea were not severe impairments for the following reasons: (1) Plaintiff did not

25

receive treatment for chronic fatigue syndrome or fibromyalgia for twelve months or more; (2) Plaintiff's obstructive sleep apnea was treated by use of a CPAP machine, and he did not pursue treatment or evaluation for sleep apnea after mid-2006, which was before his alleged onset of disability; (3) state agency reviewing physicians Dr. Sandra Eames and Dr. Aaron Mark found Plaintiff's impairments of obstructive sleep apnea, chronic fatigue syndrome, and fibromyalgia were not severe; and (4) Plaintiff improved with physical therapy, medication, and other treatment.  Furthermore, the Commissioner contends that Plaintiff waived his argument of medical equivalence by failing to identify which listing or listings he may have medically equaled and the evidence that would support such an argument.

This Court concludes that the record supports the ALJ's finding that Plaintiff's obstructive sleep apnea was not a severe impairment because Plaintiff used a CPAP machine in 2006 and never had another sleep study.  (Tr. 288, 290.)  Although Plaintiff complained of poor sleep and fatigue after his alleged onset date, none of his medical providers attributed his fatigue or poor sleep to obstructive sleep apnea, presumably because use of the CPAP machine resolved the apnea.  Of course, fatigue can be caused by something other than sleep apnea.

The record, however, does not support the ALJ's finding that Plaintiff was not treated for chronic fatigue or fibromyalgia for twelve months or longer. Plaintiff was found to have "probable" chronic fatigue syndrome in October 2007,

and Plaintiff was first diagnosed and treated for chronic fatigue syndrome on December 22, 2007. (Tr. 384–85.) And Dr. Radovsky continued to treat Plaintiff for chronic fatigue syndrome through April 2009. (Tr. 566.)

Plaintiff's diagnosis of fibromyalgia is less clear. Dr. Radovsky reviewed Plaintiff's fibromyalgia intake questionnaire on December 22, 2007, and found it compatible with a diagnosis of chronic fatigue syndrome, but she did not include fibromyalgia in her diagnosis. (Tr. 384.) In Dr. Radovsky's earlier examination of Plaintiff in October 2007, only one of eighteen fibromyalgia tender points were present.[9] (Tr. 385.) However, a physical therapy treatment record from HealthEast Optimum Rehabilitation[10] indicates that Plaintiff was referred by Dr. Radovsky, and his diagnosis was fibromyalgia. (Tr. 554.) Dr. Radovsky included a diagnosis of fibromyalgia in her treatment record of February 10, 2008. (Tr. 383.) And Dr. Radovsky continued to treat Plaintiff for fibromyalgia

---

[9] According to the American College of Rheumatology's standards, "fibromyalgia is diagnosed based on widespread pain with tenderness in at least eleven of eighteen sites known as trigger points." *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003). However, in 2010 the American College of Rheumatology provisionally approved new diagnostic criteria for fibromyalgia and measurement of symptom severity that do not rely on a tender point examination. *See The American College of Rheumatology Preliminary Diagnostic Criteria for Fibromyalgia and Measurement of Symptom Severity*, available at http://www. rheumatology.org/practice/clinical/classification/fibromyalgia/2010_Preliminary_D iagnostic_Criteria.pdf. The 2010 criteria were modified in 2011. *See* Neha Garg, M.D. and Atul Deodhar, M.D., *New and Modified Fibromyalgia Diagnostic Criteria ambiguity, uncertainty, and difficulties complicate diagnosis and management*, The Journal of Musculoskeletal Medicine, February 8, 2012, available at http://www.musculoskeletalnetwork.com/display/article/1145622/2029536.

[10] Plaintiff's first physical therapy visit at HealthEast Oakdale was on February 25, 2009, and his physical therapist was John Hecimovich. (Tr. 554.)

through April 2009.  (Tr. 566.)  Although it is not clear how Dr. Radovsky arrived

at the fibromyalgia diagnosis, the record does reflect that she diagnosed and

treated Plaintiff for fibromyalgia for more than a year, contrary to the ALJ's

finding.[11]

The fact that the record does not support the ALJ's finding that Plaintiff

was not treated for chronic fatigue or fibromyalgia for twelve months or longer,

however, does not end the inquiry as to whether the record was fully developed.

To be a severe impairment, the impairment need not only meet the duration

requirement, but it must also significantly limit an individual's physical or mental

ability to do basic work activities.  20 C.F.R. § 404.1520(a)(4)(ii), (c).  Severity is

a de minimus standard, *Hudson v. Bowen*, 870 F.2d 1392, 1395 (8th Cir. 1989),

but an impairment or combination of impairments is not severe if it would have no

more than a minimal effect on the claimant's ability to work.  *Page v. Astrue*, 484

F.3d 1040, 1043 (8th Cir. 2007).  The question, therefore, is whether the record

was developed properly in order for the ALJ to determine the severity of Plaintiff's

impairments.

First, this Court agrees with the Commissioner that Plaintiff waived any

argument of medical equivalence based on chronic fatigue syndrome, obstructive

sleep apnea, and fibromyalgia by failing to indicate which listing might have been

---

[11]     This Court notes that the ALJ included impairments of obstructive sleep
apnea, chronic fatigue syndrome, and fibromyalgia in the hypothetical question to
the vocational expert (Tr. 32), rendering any error at step two of the evaluation
harmless.

equaled or any specific evidence supporting such an argument. *See Aulton v. Astrue*, 277 F. App'x. 663, 664 (8th Cir. 2008) (declining to consider undeveloped listing argument).

Second, it is apparent that the record contains conflicting medical opinions on whether chronic fatigue syndrome and fibromyalgia caused more than minimal limitations in Plaintiff's physical or mental ability to do basic work activities. Therefore, the issue of whether the ALJ correctly determined the limitations caused by Plaintiff's chronic fatigue syndrome and fibromyalgia remains. However, just because there are conflicting opinions, does not mean that the record was not fully developed so that the ALJ could determine Plaintiff's limitations. This Court concludes that there is sufficient evidence in the record to allow for a determination of Plaintiff's limitations caused by chronic fatigue syndrome and fibromyalgia, as Plaintiff was treated for these conditions for more than a year. Therefore, the ALJ was not required to further develop the record. *See Eichelberger v. Barnhart*, 390 F.3d 584, 592 (8th Cir. 2004) (stating that further development of the record was unnecessary where no crucial issue was left undeveloped).

B.     **Whether the ALJ's RFC determination is supported by substantial evidence in the record**

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a). In determining a claimant's RFC, the ALJ must consider all relevant evidence and evaluate the claimant's credibility.

*Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). The ALJ must consider

every medical opinion in the record. 20 C.F.R. §§ 404.1527(c), 416.927(c). If a

treating physician's opinion is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence, it is given controlling weight. *Renstrom v. Astrue*, 680 F.3d 1057, 1064

(8th Cir. 2012). "However, [a] treating physician's opinion does not automatically

control, since the record must be evaluated as a whole." *Id.* (quoting *Perkins*,

648 F.3d at 897). "An ALJ must resolve conflicts among the various [medical]

opinions," and "[t]he ALJ may reject [the conclusions of any medical expert,

whether hired by the claimant or the government] if they are inconsistent with the

record as a whole . . ." *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009)

(quoting *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007)).

### 1. Whether the ALJ was required to grant controlling weight to Plaintiff's treating physicians' opinions

Plaintiff contends that the ALJ's reasons for discounting his treating

physicians' opinions "amount to nothing other than the ALJ substituting his

judgment for that of the doctors." (Doc. No. 12, Pl.'s Mem. in Supp. of Mot. for

Summ. J. ("Pl.'s Mem.") 13–14.) Plaintiff contends that Dr. Radovsky, Dr. Gluek,

and Physical Therapist Jan Hanson issued consistent opinions of Plaintiff's

limitations that the ALJ should have adopted. Plaintiff acknowledges that the ALJ

rejected the treating physicians' and physical therapist's opinions as inconsistent

with Plaintiff's activity level, but asserts that the opinions were based on Plaintiff's ability to perform work on a full-time, day-to-day basis in a regular work setting.

The Commissioner points out that Dr. Gill and other treating sources routinely found Plaintiff's mental condition to be "mostly" normal (Doc. No. 15, Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 15), and Plaintiff noted improvement in symptoms from medication and physical therapy. The Commissioner asserts that this evidence supports the ALJ's analysis of the medical opinions. Also, the Commissioner asserts that the ALJ was not required to give a physical therapist's opinion controlling weight because a physical therapist is not an accepted medical source. In addition, Plaintiff made no specific argument on how the consultative examiner's and state agency reviewing physicians' opinions, adopted by the ALJ, were unsupported by the record. The Commissioner asserts the state agency and consultative examiners' opinions are "far more consistent" with the record than the treating physicians' opinions. (Def.'s Mem. 16.)

The record reflects that Dr. Radovsky diagnosed Plaintiff with fibromyalgia and chronic fatigue syndrome and treated him for those conditions. Fibromyalgia and chronic fatigue syndrome cannot be verified by laboratory testing; they are primarily diagnosed based on a complex of symptoms for which there is no other medical diagnosis. *See* Social Security Ruling (SSR) 12-2p (SSA), 2012 WL 3104869 (July 25, 2012) (fibromyalgia); SSR 99-2p (SSA), 1999 WL 271569 (April 30, 1999) (chronic fatigue syndrome). Therefore, the question becomes

whether Dr. Radovsky's opinion is consistent with the other substantial evidence in the record.

Dr. Radovsky's opinion was based on Plaintiff's severe intermittent fatigue and his difficulty predicting when he would have a bad day. (Tr. 499.) She opined that Plaintiff could stand or walk four hours in an eight-hour day, thirty minutes at a time; sit four hours in an eight-hour day, thirty minutes at a time; occasionally lift thirty pounds, frequently lift five pounds; occasionally climb and balance, reach, handle, and feel; and never stoop, crouch, kneel, crawl, push, or pull. (Tr. 496–99.) However, before Plaintiff began physical therapy for fibromyalgia in February 2008, he never complained of limitations in his physical activities; he complained only of limitations in his mental abilities. His infrequent physical complaints were of chronic sinus problems and occasional migraine headaches, treated with Excedrin Migraine. (Tr. 263, 279, 385, 434, 436.) He complained only once of low back pain, but told Dr. Radovsky he had neck and shoulder pain since he was in an accident in 1978. (Tr. 337, 385.) He worked despite this pain for many years, as his alleged onset date is November 2006. In addition, Plaintiff was never treated for "pain and diffuse achiness" (Tr. 384) before Dr. Radovsky referred him to physical therapy to treat fibromyalgia.

Further, Plaintiff's activities were inconsistent with the physical limitations described by both Dr. Radovsky and Jan Hanson. Plaintiff's daily activities, hobbies, and other occasional activities reflect a physically active person capable of a full range of exertional activities, as the state agency physicians' opined, and

the ALJ agreed.  (Tr. 344, 419–21, 18.)  Those activities included housework, caring for an adult disabled son, caring for his dog, shopping, home repair and remodeling projects, helping friends and neighbors with projects, helping a friend move out-of-state on a ten-day trip, yard work, walking, biking, bike repair, art projects, and fishing.  (Tr. 129–33, 149–56, 349.)   In addition, in function reports for the Social Security Administration, neither Plaintiff nor his wife described Plaintiff as having any physical limitations with sitting, standing, lifting, or postural positions.  (Tr. 134, 154.)  Although Plaintiff's primary complaint was fatigue, in their function reports, Plaintiff and his wife did not describe his fatigue as occurring after the performance physical activities, but instead it was a sense of mental fatigue from poor sleep and depression, causing low motivation.  (Tr. 136, 156.)  And both Plaintiff's wife and Dr. Gluek attributed Plaintiff's inability to finish tasks to ADHD and depression.  (Tr. 156, 618.)

Also, even when Plaintiff complained of diffuse pain and achiness when he was first treated for fibromyalgia, the pain resolved fairly quickly with physical therapy, although the fatigue did not.  (Tr. 430, 473, 576.)  For example, it was after Plaintiff started physical therapy for fibromyalgia that he was able drive thirty hours to Texas, help a friend move his things, and fly home.  (Tr. 434, 473–74.)  Plaintiff was tired after this trip and had a flare of his old neck pain (Tr. 434, 473), but this type of activity would be strenuous for most people, regardless of fibromyalgia or chronic fatigue syndrome.  Plaintiff's pain improved again with continued physical therapy, and by September 2008, his pain was rare.

(Tr. 540.)  Thus, this Court finds that there is substantial evidence in the record supporting the ALJ's decision to discount Dr. Radovsky's and Physical Therapist Jan Hanson's physical RFC opinions, and supporting the ALJ's finding that Plaintiff was physically able to perform a full range of exertional activities.

The next question is what mental limitations were caused by Plaintiff's fatigue and other mental impairments.  Dr. Radovsky and Dr. Gluek gave their opinions of Plaintiff's mental residual functional capacity.  Dr. Radovsky opined that Plaintiff could not work, basing Plaintiff's limitations on fatigue, depression, and ADHD.  (Tr. 493–95.)  She noted that Plaintiff would be markedly limited in maintaining attention and concentration.  (Tr. 493.)  Dr. Gluek wrote that when Plaintiff's pain, fatigue, and depression were at an extreme level, he had trouble with memory, articulation, and organization of thoughts, reduced stress tolerance, mild difficulty with simple job instructions, and extreme difficulty with complex job instructions.  (Tr. 618.)  He also stated that when Plaintiff's depression increased in the winter months, he had marked difficulty in behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability.  (*Id.*)  Additionally, Dr. Gluek opined that ADD interfered with Plaintiff's ability to stay on task, concentrate, and organize his thoughts. (*Id.*)

Dr. Craig Barron, a consultative examiner who saw Plaintiff on October 2, 2007, also evaluated Plaintiff's mental RFC, and the ALJ adopted Dr. Barron's opinion.  (Tr. 18.)  Dr. Barron opined that Plaintiff was capable of communicating,

comprehending, and retaining simple directions at an unskilled competitive level, withstanding work-related stresses, attending work regularly, rapidly performing routine, repetitive activities on a sustained basis, meeting production requirements, and relating to others at an unskilled competitive employment level. (Tr. 350.)

There is no objective measurement of the severity of limitations caused by Plaintiff's fatigue, depression, and ADHD in the record. Therefore, the treating physicians' opinions are entitled to controlling weight if they are consistent with substantial evidence in the record as a whole. The record supports a finding that Plaintiff's depression increased in the late fall and winter, and that he had more difficulty focusing on tasks and feeling motivated. This Court can find no evidence, however, supporting Dr. Gluek's opinion that when Plaintiff's depression was at an extreme level, he had marked difficulty in behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability. In fact, this Court has not found any treatment record indicating an occasion when Plaintiff's depression or fatigue appeared to be extreme.[12] As the ALJ noted, Plaintiff's mental status examinations indicated only that his mood was depressed, and his affect was sometimes sad, but otherwise, the examinations were normal. (Tr. 302, 303, 392, 395, 428.) In

_____

[12] Dr. Gluek's treatment records are not in the administrative record, but Plaintiff was given an opportunity to submit all treatment records, and there is no indication in the record why he did not do so. (Tr. 617, 24, 35, 6.)

addition, Dr. Gill, who prescribed Plaintiff's mental health medications, did not document any clinical observation of Plaintiff's fatigue.

Plaintiff first associated his depressed mood in the winter months with not having work as a self-employed person. (Tr. 293–94, 332.) He then went on job interviews in the spring and summer of 2007. (Tr. 331, 334.) In May 2007, Plaintiff said he considered doing something other than self-employment, but he probably would not unless "something attractive [came his] way." (Tr. 332.) And in September 2007, Plaintiff said he felt he needed medical help before he could "begin to act," presumably with finding employment. (Tr. 401.) But Plaintiff's primary complaint was fatigue. His fatigue started in the 1990s when his disabled son was young and needed much care, and Plaintiff worked full-time. (Tr. 279, 321.) The fatigue continued but did not prevent Plaintiff from engaging in self-employment until November 2006. (Tr. 157.) Plaintiff's ADHD or ADD was a lifelong condition (Tr. 279), which did not prevent Plaintiff from working in substantial gainful activity before November 2006. Thus, the record could support more than one conclusion about Plaintiff's condition. Plaintiff's fatigue and depression may have worsened after November 2006, rendering him unable to work in full-time competitive employment. On the other hand, Plaintiff may no longer have been able to get satisfactory work through self-employment and gave up looking. Plaintiff's wife suggested that Plaintiff might work if he had treatment (which he was receiving), and job training and placement (which he was not receiving). (Tr. 156.)

Dr. Barron's opinion reflects a person who has some mental limitations, but is nevertheless capable of some full-time competitive work activity. Because the record supports a conclusion consistent with the ALJ's decision to adopt Dr. Barron's opinion, the Court should affirm the ALJ. The Court must, however, also consider the ALJ's credibility analysis.

## 2. Whether the ALJ erred in discounting Plaintiff's credibility

Plaintiff asserts that the ALJ's failure to consider all *Polaski* factors in making his credibility determination is reversible error. Plaintiff also contends that the ALJ's finding that Plaintiff received significant relief of symptoms with use of medication is contrary to his physicians' opinions. The Commissioner, on the other hand, points out that the ALJ said he considered each *Polaski* factor, and asserts that the ALJ was not required to discuss each factor. In addition, Plaintiff did not elaborate on any factor that supported Plaintiff's credibility, other than his physicians' opinions. The Commissioner also asserts that the record supports the ALJ's finding that Plaintiff's symptoms improved with medication.

When analyzing a claimant's subjective complaints, the ALJ must consider the following credibility factors: 1) daily activities; 2) duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness, and side effects of medication; and 5) functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ must consider but need not specifically discuss each *Polaski* factor. *Halvorson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010). The ALJ may not discount a claimant's credibility

solely because the objective evidence does not fully support his subjective complaints, but may discount credibility based on inconsistencies in the record as a whole. *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005). Courts should defer to the ALJ's credibility findings when the ALJ gives good reasons that are supported by substantial evidence. *Guilliams*, 393 F.3d at 801 (citing *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003)).

Plaintiff testified that he quit working because it wore him down physically and mentally; he fatigued easily and it took him several days to recover from working. (*Id.*) He testified that he no longer made plans and was socially isolated, that he had bad days once or twice a week, and that he used to enjoy reading but could now only read a paragraph or two at a time. (Tr. 28–29.) He also stated that he had trouble completing tasks due to pain and fatigue, and he would stop to lie down and relax. (Tr. 29–30.)

The ALJ considered the *Polaski* factors in his analysis. The ALJ found Plaintiff not fully credible because his activities were inconsistent with disability and his symptoms were significantly relieved with medication. (Tr. 19.) Both of these findings are supported by substantial evidence in the record. Plaintiff's activities, as discussed above, indicate a person who can physically and mentally perform many tasks. While Plaintiff's symptoms were not fully resolved with medication, Plaintiff reported that Adderall improved his alertness (Tr. 394), Ambien CR helped him sleep longer (Tr. 384), and he also felt some benefit from antidepressants. (Tr. 296, 27.) In addition, Plaintiff's mental status examinations

did not substantiate his claims of cognitive impairment preventing him from working.  Finally, although not discussed by the ALJ, there is evidence in the record suggesting that Plaintiff's low motivation was at least in part due to inability to advance beyond an entry level job and to find a job that was attractive to him.  (Tr. 136, 332.)  *See Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (affirming ALJ's credibility determination where claimant lacked motivation to return to work activity).  Accordingly, the ALJ did not err in discounting Plaintiff's credibility.

### C.    Whether the ALJ posed an accurate hypothetical question to the vocational expert

The ALJ's hypothetical question need "include only those impairments that the ALJ finds are substantially supported by the record as a whole."  *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994) (citing *Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993)).  Because this Court finds substantial evidence supporting the ALJ's RFC determination, the ALJ's hypothetical question based on that RFC determination was proper, and the vocational expert's testimony in response to the ALJ's hypothetical question constitutes substantial evidence upon which the ALJ could rely in finding Plaintiff capable of performing other work that exists in the economy.  *See Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996) ("Testimony from a VE based on a properly phrased hypothetical question constitutes substantial evidence.").  For these reasons, this Court recommends affirming the ALJ's decision.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 11), be **DENIED**;

2.      Defendant's Motion for Summary Judgment (Doc. No. 14), be

**GRANTED**; and

3.      If this Report and Recommendation is adopted, that judgment be

entered.


Date: November 9, 2012                    _s/ Jeffrey J. Keyes_____
                                          JEFFREY J. KEYES
                                          United States Magistrate Judge


Under Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **November 23, 2012,** a writing which specifically identifies those portions of this Report and Recommendation to which objections are made and the bases of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.